_____

**SO ORDERED,**



**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.
_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

IN RE:        **BROOKS CUSTOM APPLICATION, LLC**        **CASE NO. 25-13062-SDM**

**DEBTOR**                                              **CHAPTER 11**

**MEMORANDUM OPINION AND ORDER APPROVING APPLICATION FOR**
**EMPLOYMENT**

The matter before the Court is the Debtor's Application to Employ Watkins, Ward and

Stafford ("WWS") as accountant [Dkt. #46] (the "Application"). The United States Trustee (the

"UST") filed an initial response [Dkt. #54], an amended response [Dkt. #78], a memorandum of

authorities addressing the meaning of "relative" under 11 U.S.C. § 101(45) [Dkt. #82], and a reply

to the Debtor's memorandum brief [Dkt. #87]. In response, the Debtor filed a memorandum brief

in support of the Application [Dkt. #83] and later supplemented the record with additional evidence

[Dkt. #90].[1] The Court held an evidentiary hearing at which John Paul Brooks, the Debtor's owner

---

[1] The Debtor's *Motion to Supplement Evidence* [Dkt. #90], filed after the evidentiary hearing, seeks to supplement the record with its *Third Motion to Extend Exclusivity* [Dkt. #89] and related matters. The Debtor contends that the UST's objection to the Application has delayed its ability to prepare monthly operating reports, cash flow projections, and a meaningful disclosure statement and plan, and further asserts that such circumstances support its position, including its reliance on a "doctrine of necessity." The UST filed a response in opposition [Dkt. #94], disputing the applicability of any "doctrine of necessity" to professional employment under § 327 and denying that any delay is attributable to the UST's objection. To the extent the filing constitutes a request to supplement the record, that request is granted. The Court has considered the

and managing member, and Jason D. Brooks, a partner of WWS, testified. The issues presented are whether WWS may be employed under 11 U.S.C. § 327(a)[2] where Jason Brooks is the first cousin of the Debtor's principal, WWS held a prepetition claim against the Debtor, and WWS received postpetition payments prior to approval of its employment.

For the reasons set forth below, the Court concludes that none of these issues, individually or collectively, require disapproval of the Application. WWS's status as a prepetition creditor raises a disinterestedness concern, but one that may be cured under the circumstances presented here, consistent with § 1107(b) and applicable case law. Further, the Court concludes that WWS does not hold or represent an interest adverse to the estate. And although the postpetition payments were improper, they do not, standing alone, warrant disapproval. Accordingly, the Application will be approved, subject to conditions designed to ensure full compliance with the Bankruptcy Code and Rules.

### I. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District.

### II. BACKGROUND

The Debtor filed this Chapter 11 case on September 16, 2025. The Application seeks authority to employ WWS as the Debtor's accountant. In the Application, the Debtor disclosed that Jason Brooks, a principal of WWS, is a cousin of John Paul Brooks, the Debtor's owner and

---

supplemental materials and the UST's response in reaching its ruling. The supplemental filing does not alter the Court's analysis but provides additional context for the Debtor's arguments regarding timing and case administration, which the Court has considered.

[2] All statutory references will be to Title 11 of the United States Code unless indicated otherwise.

managing member. The UST objected, initially contending that because Jason Brooks is a cousin to the Debtor's owner, he is an insider and therefore not disinterested under § 327(a).

The UST later amended its objection to add that WWS was also a prepetition creditor of the Debtor in the scheduled amount of $35,536.18 and therefore was not disinterested absent a waiver of that claim. The amended response cited *In re Fish & Fisher, Inc.*, No. 09-02747-EE, 2010 WL 5256992 (Bankr. S.D. Miss. Dec. 17, 2010), for the proposition that an applicant holding an economic stake in the estate's payout cannot satisfy the disinterestedness requirement.

Thereafter, the UST filed a memorandum on the "relative" question. In that memorandum, the UST argued that the operative "common law" under § 101(45) is the law of the state in which the bankruptcy case was filed.[3] The UST urged the Court to adopt the canon-law method of calculating consanguinity and thereby treat first cousins as relatives within the third degree.

The Debtor, in turn, filed a memorandum brief asserting that a first cousin is not within the third degree of consanguinity and therefore is not a "relative" under § 101(45).[4] The Debtor also argued that, regardless of the consanguinity question, WWS had no adverse interest to the estate and that practical necessity favored approval because WWS had served as the Debtor's accountanting firm for over twenty years and was uniquely positioned to continue serving at lower cost. The Debtor framed that latter point in terms of the doctrine of necessity, citing *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002), and similar cases addressing critical vendor relief in Chapter 11 proceedings. The UST replied that *U.S. v. Halat*, No. 2:07CV99KS-MTP, 2008 WL

---

[3] The UST relied principally on *In re Olympia Office LLC*, 562 B.R. 8 (Bankr. E.D.N.Y. 2017), *In re Gray*, 355 B.R. 777 (Bankr. W.D. Mo. 2006), and *In re Cloverleaf Farmers Co-operative*, 114 B.R. 1010 (Bankr. D.S.D. 1990).

[4] The Debtor relied on Mississippi and federal authorities including *U.S. v. Halat*, No. 2:07CV99KS-MTP, 2008 WL 1776491 (S.D. Miss. Apr. 18, 2008), *In re Estate of Ford*, 552 So. 2d 1065 (Miss. 1989), *In re Hydraulic Indus. Prods., Co.*, 101 B.R. 107 (Bankr. E.D. Mo. 1989), and *In re Olympia Office, LLC*, 562 B.R. 8 (Bankr. E.D. N.Y. 2017).

1776491 (S.D. Miss. Apr. 18, 2008), is an unpublished district court decision with no precedential value and provides little analytical guidance on the meaning of "relative" under § 101(45), that *In re Estate of Ford*, 552 So. 2d 1065 (Miss. 1989), is distinguishable, that *Black v. State*, 187 So. 2d 815 (Miss. 1966), reflects Mississippi's recognition of consanguinity principles, and that the doctrine of necessity cannot override the express requirements of § 327(a).

At the hearing, John Paul Brooks testified that he is the owner and day-to-day decisionmaker for the Debtor, a custom application business that sprays chemicals and spreads fertilizer, lime, and chicken litter and employs thirty-three people. He testified that WWS has handled the Debtor's accounting for approximately twenty-three years, including payroll, monthly financial statements, tax work, and related accounting services. He further testified that replacing WWS would be "a pretty good mess," would require substantial time to get a new accountant up to speed, and that the Debtor did not have excess funds to pay a new firm to catch up on years of accounting history.

John Paul Brooks also testified that WWS was owed $35,536.18 as of the petition date and that WWS had agreed to waive those fees. He further testified that, after the petition date, the Debtor paid WWS a $15,000 retainer and made additional postpetition payments without prior Court approval, although he could not state the precise total at the hearing. The record as a whole reflects that the total postpetition payments approached the amount of the prepetition claim, a point emphasized by the UST. He acknowledged he had not obtained the waiver in writing. On cross-examination, he also confirmed that the Debtor had not looked for another accounting firm and that WWS was listed on both the original and amended schedules as an unsecured creditor in the amount of $35,536.18.

Jason Brooks testified that he is a CPA and partner at WWS, that he has worked on Brooks Custom since its inception, and that while he is the principal contact, multiple levels of firm personnel perform the work. The firm uses paraprofessionals, bookkeepers, senior accountants, and supervisory review, with Jason Brooks performing a high-level final review before the firm signs off on the financial statements. He testified that this staffing model is designed to delegate work to the lowest but still competent billing level to keep costs down, that since the bankruptcy filing the firm had spent about 130 hours on the matter of which approximately 26 hours were his, and that the firm's familiarity with the Debtor allows it to provide services more cheaply than a new accounting firm could.

Jason Brooks also testified that the firm could remain objective notwithstanding the cousin relationship and that it would assist with monthly operating reports, tax returns, withholding returns, and likely cash-flow projections for a plan and disclosure statement. At closing, the Debtor's counsel expressly invoked the "let's be practical doctrine" and argued that if doctrines such as necessity or critical-vendor workarounds mean anything, they should apply here because of the time and effort invested in the relationship. The UST responded that critical-vendor doctrine concerns payment issues, not the employment of professionals governed by § 327, and emphasized the two disinterestedness problems, i.e., relative/insider status and creditor status, along with the troubling postpetition payments.

**A. Overview of the Parties' Positions**

Stated more succinctly, the UST's position is that the Application must be denied for three related reasons. First, Jason Brooks is the first cousin of the Debtor's only owner and managing member, John Paul Brooks, which, in the UST's view, makes him a "relative" under § 101(45), an insider under § 101(31), and thus not disinterested under § 327(a). Second, WWS was a scheduled

prepetition creditor in the amount of $35,536.18, which independently defeats disinterestedness unless the claim is effectively waived. Third, the UST argues that the Debtor's doctrine-of-necessity theory is misplaced because whatever flexibility bankruptcy courts may have in dealing with critical vendors does not permit the Court to override the specific statutory requirements for employment of professionals.

The Debtor's position is likewise threefold. First, the Debtor contends that a first cousin is not a "relative" under § 101(45) because first cousins are related in the fourth degree of consanguinity under the proper common-law method. Second, the Debtor argues that even if Jason Brooks were considered a relative or insider, that fact alone does not establish an adverse interest or require denial of the Application. Last, the Debtor emphasizes the practical necessity of retaining WWS given its twenty-three-year history with the Debtor, its low-cost staffing structure, and its critical role in preparing payroll, tax filings, monthly operating reports, and projected financial information needed for the reorganization. These arguments were presented both in the Debtor's brief and through witness testimony. The Court addresses each issue in turn.

**B. Statutory Framework Under § 327(a)**

Section 327(a) provides that the trustee, or a debtor-in-possession through § 1107(a), may employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons." 11 U.S.C. §§ 327(a), 1107(a). The statute thus contains two separate though related requirements: the professional must not hold or represent an adverse interest, and the professional must be disinterested.

Section 101(14) defines a "disinterested person," in relevant part, as a person that "is not a creditor. . . or insider" and "does not have an interest materially adverse to the interest of the estate." 11 U.S.C. § 101(14)(A), (C). A professional has an "adverse interest" to the estate if they

possess "either an actual or potential dispute in which the estate is a rival claimant" or a predisposition that would impair its duty of loyalty to the estate. *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012) (citing, *In re West Delta Oil Co.*, 432 F.3d 347, 356 (5th Cir. 2005)). These requirements are distinct. The disinterestedness inquiry is status-based, while the adverse interest inquiry is functional, focusing on whether the professional's judgment or loyalty is impaired. See *In re Age Refining, Inc.*, 447 B.R. 786, 802 (Bankr. W.D. Tex. 2011) (explaining that "adverse interest" turns on whether the professional has a meaningful incentive to act contrary to the estate and its creditors.) (internal citations omitted). That distinction matters here. The Bankruptcy Code does not treat every connection or status as automatically disqualifying. Instead, it requires a practical, case-specific assessment of whether the professional can exercise independent judgment in service of the estate. *West Delta Oil Co.*, 432 F.3d at 356.

Section 1107(b) modifies this framework in Chapter 11 by providing that a professional is not disqualified "solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b). Thus, the issues presented here require the Court to apply the statutory framework of § 327(a) and to consider the effect of § 1107(b) in this Chapter 11 case. The interaction of these provisions governs the Court's analysis.

Before diving in, the point bears emphasis that the Bankruptcy Code does not say any family relationship, standing alone, automatically disqualifies a professional. Nor does § 327(a) say that insider status is, by itself, an adverse interest. What § 327(a) requires is a closer look at the actual relationship, any economic stake, and whether the professional's loyalty or judgment is materially impaired. *West Delta Oil Co.*, 432 F.3d at 356. Courts addressing § 327 regularly distinguish between formal connections, which must be disclosed, and disabling conflicts, which must be remedied or result in denial. See, e.g., *West Delta Oil Co.*, 432 F.3d at 356; *Am. Int'l*

*Refinery*, 676 F.3d at 461–63; *In re Roberts*, 46 B.R. 815, 826–27 (Bankr. D. Utah 1985). That framework controls here.

**C. Whether a First Cousin is a "Relative" Under § 101(45)**

The UST first raises the issue that Jason Brooks is a "relative" under § 101(45), and therefore an insider whose involvement renders WWS not disinterested under § 327(a). Section 101(31) defines "insider" and includes, in the case of an individual debtor, a "relative of the debtor," and in the case of a corporate debtor, relatives of directors, officers, or persons in control. 11 U.S.C. § 101(31). Section 101(45), in turn, defines "relative" as an individual related "within the third degree as determined by the common law."

The Bankruptcy Code does not define "common law" in this context, and there is no general federal common law. *In re Hydraulic Indus. Prods., Co.*, 101 B.R. 107, 108 (Bankr. E.D. Mo. 1989) (citing, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). In the absence of a uniform federal rule, courts look to applicable nonbankruptcy law, including state law, to inform the content of "common law" for purposes of § 101(45). *Butner v. United States*, 440 U.S. 48, 55 (1979). This may result in some variation among jurisdictions, but that is not unusual. Bankruptcy courts routinely rely on state law to define property rights and legal relationships. This case squarely presents a question that deserves a direct answer: does a first cousin fall within the phrase "related by affinity or consanguinity within the third degree as determined by the common law" in § 101(45)? The Court concludes that the answer is no.

The parties agree that the Bankruptcy Code directs the Court to determine degree "as determined by the common law." Where they part company is over what that phrase means. The UST argues that Mississippi common law, as reflected by *Black v. State*, 187 So. 2d 815 (Miss. 1966), supports the canon-law method of computation. The UST also relies on bankruptcy

decisions from other jurisdictions, including *In re Gray*, 355 B.R. 777 (Bankr. W.D. Mo. 2006), and *In re Cloverleaf Farmers Co-operative*, 114 B.R. 1010 (Bankr. D.S.D. 1990), which applied similar counting principles in different Bankruptcy Code contexts. The Debtor contends that the better reading of § 101(45), Mississippi succession law, and the more persuasive bankruptcy decisions support the civil-law method, under which first cousins are related in the fourth degree. The cases cited by the parties illustrate the split.

In *Gray*, 355 B.R. at 780–81, a preference action, the bankruptcy court considered both canon-law and civil-law methods of calculating consanguinity under Missouri law and ultimately adopted the canon-law method, reasoning that it better aligned with the policy underlying § 547. The decision was thus influenced by the specific statutory context before it. The UST relies heavily on that policy-driven choice.

By contrast, *Hydraulic*, 101 B.R. at 109, adopted the civil-law method and held that first cousins are not within the third degree. *Hydraulic* treated the statutory text more literally and refused to equate "common law" with a broader canon-law approach when the practical result would be to expand the statutory definition of "relative." *Id*.

*In re Olympia Office, LLC*, 562 B.R. 8, 12 (Bankr. E.D. N.Y. 2017), is particularly useful because it carefully collected the sparse authorities and explained that relatively few bankruptcy decisions have addressed the meaning of "common law" in § 101(45). *Olympia* recognized the tension between *Gray*, and *Hydraulic* and observed that courts have not been uniform in deciding whether to follow canon law or civil law. *Id*. The UST also cites *Cloverleaf*, 114 B.R. at 1014, a Chapter 12 case, where the court adopted what it described as the "single count common law method" in determining family-farmer qualification and emphasized uniformity. Yet *Cloverleaf* involved a different statutory setting and, like *Gray*, was influenced by context-specific policy

concerns. The Court does not read *Cloverleaf* as compelling the canon-law method in every

Bankruptcy Code use of familial-degree language.

Mississippi authorities point in different directions depending on context, and that is

precisely why *Black*, 187 So. 2d 815, is less helpful here than the UST suggests. *Black* was a

criminal recusal case. *Id.* at 816. The court there held that a trial judge should have recused where

he was first cousin to a prosecution witness. *Id.* at 819. Notably, *Black* did not undertake any

analysis of degrees of consanguinity or attempt to determine whether first cousins fall within a

particular degree. Rather, it arose under Mississippi constitutional and judicial-disqualification

principles, which historically have been construed broadly to preserve public confidence in the

judiciary. Indeed, the Mississippi Constitution provides, in sweeping terms, that "[n]o judge of any

court shall preside on the trial of any cause" where a party is "connected with him by affinity or

consanguinity," without limitation as to degree. MISS. CONST. art. 6, § 165. The issue there was

not the meaning of "relative" in a federal bankruptcy statute. The policy of broad recusal rules

does not answer the meaning of § 101(45), which contains its own limiting language, "within the

third degree", and therefore reflects Congress's decision not to treat all family ties alike.

The Debtor's reliance on *In re Estate of Ford*, 552 So. 2d 1065 (Miss. 1989), is more

persuasive, though not because it directly construes § 101(45). The UST argues that *Ford* arises in

a different context and is not controlling here, a point the Court acknowledges but does not find

dispositive. *Ford* reflects Mississippi's use of civil-law principles in determining degrees of

kinship. There, the court explained that once statutory categories are exhausted, "the rules of the

civil law" govern the ranking of kindred and determine their relative degree. *Id.* at 1066. Applying

that framework, the court recognized that first cousins are relatives in the fourth degree, a rank

lower than that of closer statutory heirs. *Id.* at 1066-67. The fact that *Ford* arose in an inheritance

dispute rather than a bankruptcy case does not make it irrelevant. Succession law has long been one of the principal areas in which degree-of-relationship rules are developed and applied, and its reasoning is consistent with the Court's interpretation of § 101(45).

The Court finds the better view is the civil-law method for three reasons. First, the statutory text itself is limiting. Congress did not say "family member." It did not say "close relation." It said, "within the third degree." A method that transforms first cousins into third-degree relatives broadens the statute rather than construing it narrowly. Second, the canon-law method's principal support in the cases arises from context-specific policy choices, most notably in preference law. *Gray*, 355 B.R. at 781-82, expressly chose a method that best fits § 547's equal-distribution policy. That is a sensible piece of statutory reasoning in that context, but it is not a neutral linguistic conclusion about what § 101(45) means everywhere else in the Code. Here, the statute to be applied is § 327(a), and it contains its own independent safeguards, i.e., disinterestedness and adverse-interest analysis. There is less reason to stretch the definition of "relative" to protect the estate because the Code already requires a broader conflict inquiry.

Third, the civil-law method better respects the structure of § 327(a). If courts were to treat first cousins as relatives within the third degree, many rural and family-operated businesses would face automatic insider objections in settings where the actual question is not kinship alone but whether the proposed professional can exercise independent judgment. Congress did not need a sweeping definition to police such cases because § 327 already requires courts to evaluate adverse interests and actual loyalty. Under the civil-law method, first cousins are in the fourth degree: one ascends from one cousin to the common grandparent and then descends to the other cousin. That is one step to the parent, a second to the grandparent, a third to the uncle or aunt, and a fourth to the cousin. Under that approach, Jason Brooks is not a "relative" under § 101(45). Accordingly,

the Court holds that a first cousin is not a "relative" within the meaning of § 101(45). This interpretation gives effect to the limiting language chosen by Congress and avoids expanding the definition of "relative" beyond its statutory text. That holding also resolves the UST's primary statutory-insider argument. But because the parties have fully briefed the alternative issue, and because it remains relevant to future cases, the Court addresses whether the result would differ even if a first cousin were deemed a relative.

**D. Even If Jason Brooks Were a "Relative," that Fact Alone Would Not Require Disapproval of the Application**

Even assuming, for the sake of completeness, that Jason Brooks was a "relative" within the meaning of § 101(45) and therefore an insider, that would not end the analysis. Section 327(a) does not impose a per se prohibition on the employment of professionals who have insider relationships with a debtor. Rather, the statute asks two separate questions: whether the professional is disinterested and whether the professional holds or represents an interest adverse to the estate. 11 U.S.C. § 327(a).

These requirements are related but distinct. The Fifth Circuit has emphasized that both inquiries are functional, not merely formal. A professional may fail the disinterestedness prong in certain circumstances, such as where it is a creditor, but the adverse interest analysis focuses on whether the professional possesses "either an actual or potential dispute in which the estate is a rival claimant" or a predisposition that would impair its duty of loyalty to the estate *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012) (citing, *In re West Delta Oil Co.*, 432 F.3d 347, 356 (5th Cir. 2005)).

Stated differently, the question is not simply whether a relationship exists, but whether that relationship creates a meaningful risk that the professional's judgment or loyalty will be impaired.

Here, the Court does not see that risk. WWS is not a one-person operation driven by a personal relationship. It is a multi-layered accounting firm in which work is performed and reviewed at several levels, including paraprofessionals, bookkeepers, senior accountants, and supervisory personnel, with Jason Brooks providing final quality-control review. This structure reduces the likelihood that the engagement is driven by a purely personal relationship rather than professional judgment.

There is also no evidence that WWS has used its relationship with the Debtor to further a competing interest, to influence litigation involving the estate, or to suppress disclosure of adverse facts. To the contrary, the firm is performing routine but essential accounting functions such as payroll, tax reporting, monthly operating reports, and financial projections, all of which are subject to oversight by the Court, the United States Trustee, and parties in interest.

The Court does not minimize the significance of familial connections. Such relationships must be fully disclosed and carefully scrutinized, and in some cases they may be disqualifying. But they are not self-executing bars to employment under § 327(a). Even if Jason Brooks were treated as a "relative" and thus an insider, the Court would still proceed to the more substantive questions: whether WWS holds a materially adverse interest, whether its creditor status has been sufficiently addressed, and what effect, if any, the postpetition payments should have.

### E. WWS's Prepetition Claim and § 1107(b)

The UST's amended objection correctly identifies the most straightforward statutory problem: WWS was a prepetition creditor of the Debtor in the scheduled amount of $35,536.18. That fact was confirmed by John Paul Brooks at the hearing. Under § 101(14)(A), a disinterested person cannot be a creditor. Under a plain reading of the statute then, WWS is not disinterested. The Court must therefore determine whether that conclusion is dispositive, or whether § 1107 (b)

has been interpreted to permit employment notwithstanding creditor status in certain circumstances.

Courts are divided on this issue. In *In re Talsma*, 436 B.R. 908, 915-18 (Bankr. N.D. Tex. 2010), the court concluded that § 1107(b) permits a debtor in possession to employ a professional notwithstanding its status as prepetition creditor where the claim arises solely from prepetition services rendered to the debtor. The *Talsma* court reasoned that the phrase "notwithstanding § 327(a)" must be given effect and that prepetition employment necessarily creates an economic relationship between the debtor and the professional. *Id*. at 913-14.

This Court finds that reasoning persuasive to the extent it recognizes that creditor status arising solely from prior professional services does not automatically render the professional disinterested. At the same time, creditor status remains significant because it creates a financial stake in the distribution of estate assets and must be addressed to ensure compliance with § 327(a). *West Delta Oil Co.*, 432 F.3d at 357-58.

Here, the record establishes that WWS's claim arises solely from its prepetition accounting services to the Debtor. More importantly, both the Debtor's principal and Jason Brooks testified under oath that WWS has waived its prepetition claim. That testimony was clear, unequivocal, and uncontroverted. The Court credits that testimony and finds that WWS does not intend to pursue recovery of its prepetition claim. Accordingly, the Court concludes that WWS's prepetition claim does not require denial of the Application.

That said, the absence of a written waiver presents an avoidable risk. A written, unconditional waiver provides clarity to the Court, the United States Trustee, and other parties in interest, and reduces the likelihood of later disputes regarding the scope or effectiveness of the waiver. For that reason, the Court strongly encourages parties in future cases to document any such

waiver in writing and file it on the docket. While the Court does not require that step here in light

of the testimony on the record, it represents the better practice.

## F. Adverse Interest Analysis

Section 327(a) independently requires that a professional "not hold or represent an interest

adverse to the estate." This inquiry is distinct from disinterestedness and focuses on whether the

professional has either (i) an economic interest that would tend to lessen the value of the estate or

create a dispute with the estate, or (ii) a predisposition that would impair the professional's duty

of loyalty. *West Delta Oil Co.*, 432 F.3d at 356; *American Int'l Refinery*, 676 F.3d at 461–63.

The Court finds that WWS does not hold or represent an interest adverse to the estate. First,

familial relationships alone do not create an adverse interest. There is no evidence that WWS has

used that relationship to gain an advantage over other creditors or to influence estate administration

improperly. Second, WWS's prepetition claim, while relevant to disinterestedness, does not

establish a materially adverse interest in this case. The record reflects that the claim arises solely

from prior professional services and that WWS has waived that claim through clear and

unequivocal sworn testimony. There is no evidence that WWS retains any direct or indirect

financial stake in the estate on account of that claim.

This conclusion is consistent with decisions denying employment where a professional

retains a continuing financial interest tied to the outcome of the bankruptcy case. For example, in

*In re Fish & Fisher, Inc.*, No. 09-02747-EE, 2010 WL 5256992, *5-6 (Bankr. S.D. Miss. Dec. 17,

2010), the court found that an accounting firm held an adverse interest where, despite transferring

its prepetition claim, the consideration it received remained contingent on distributions from the

estate. As a result, the firm stood to gain or lose financially depending on the outcome of the case,

creating a direct incentive to act contrary to the estate's interests. *Id.*

No such circumstance is present here. WWS does not retain any contingent or outcome-dependent interest tied to distributions from the estate, and its compensation is not structured in a manner that would create competing incentives. Next, the postpetition payments, although improper, do not demonstrate that WWS is acting in a manner adverse to the estate. Rather, they reflect noncompliance with procedural requirements governing professional compensation, which is addressed through disclosure, supervision, and potential disgorgement.

Finally, the nature of WWS's engagement supports this conclusion. The services to be performed, payroll, tax reporting, financial statements, and related accounting functions, are routine, transparent, and subject to oversight by the Court, the UST, and parties in interest. Accordingly, the Court finds that WWS does not hold or represent an interest adverse to the estate within the meaning of § 327(a).

**G. Improper Postpetition Payments**

The parties dispute the precise total and whether the funds are being held as retainers, but that dispute does not affect the Court's analysis. Regardless, these payments were improper. Professional compensation in Chapter 11 is not governed by informal business custom. Sections 327, 330, and 331 require court supervision. A debtor may not simply continue paying a professional postpetition as though the bankruptcy filing changed nothing. The UST is correct on that point. The Court nevertheless concludes that the payments, standing alone, do not require disapproval of the Application.

Several factors support this conclusion. First, the payments were disclosed. The Debtor's principal testified candidly regarding the transfers, and there is no indication that the Debtor attempted to conceal them. Second, the record reflects that the payments were intended as retainers

rather than final compensation. Testimony indicates that the funds have not been fully applied and remain subject to review.

Third, the payments do not establish that WWS holds or represents a materially adverse interest. Rather, they reflect noncompliance with the procedural requirements governing professional employment and compensation. The appropriate remedy for such noncompliance is disclosure, supervision, and, where warranted, disgorgement, not necessarily denial of employment where the requirements of § 327(a) are otherwise satisfied.

That said, the Court shares the UST's concern that the amount of postpetition payments closely approximates the prepetition claim. The Court will not permit postpetition transfers to operate, in substance, as a recovery of a waived prepetition obligation. If subsequent fee applications or disclosures demonstrate that the postpetition payments function as a workaround to repay the prepetition claim, the Court will revisit the propriety of WWS's employment and may order disgorgement or other relief.

Accordingly, WWS's compensation shall be subject to review under §§ 330 and 331, and the Debtor shall provide a full accounting of all postpetition payments. No further payments, including any portion of funds being held as retainer, may be made absent Court approval or compliance with a Court-approved retainer arrangement.

**H. Conditional Approval Despite Incomplete Rule 2014 Disclosure**

Rule 2014 requires any professional seeking employment to disclose, "to the best of the applicant's knowledge," all connections with the debtor, creditors, and parties in interest. Fed. R. Bankr. P. 2014(a). The disclosure obligation is broad and continuing, and it applies regardless of whether a connection ultimately rises to the level of a disqualifying conflict. *In re West Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005).

The UST correctly notes that the Application and supporting affidavit did not initially disclose WWS's prepetition Creditor status, notwithstanding that WWS appeared on the Debtor's schedules. That omission should not have occurred. Rule 2014 requires affirmative, complete disclosure in the application itself. Fed. R. Bankr. P. 2014(a).

The Fifth Circuit has repeatedly emphasized the importance of strict compliance with Rule 2014. Professionals who fail to disclose their connections "proceed at their own risk," and such failure may justify denial of employment or disgorgement of compensation. *West Delta Oil Co.*, 432 F.3d at 355. At the same time, the disclosure obligation is broader than the standard for disqualification, and a failure to disclose does not automatically require denial of employment in every case.

As the Fifth Circuit later clarified, a professional may lack a disqualifying adverse interest yet still be subject to sanctions for inadequate disclosure. *Amer. Int'l Refinery*, 676 F.3d at 465-66. In *American International Refinery*, the court affirmed substantial sanctions for disclosure violations even though the professional was not disqualified and was permitted to remain employed. *Id.* The appropriate remedy therefore depends on the totality of the circumstances, including the nature of the omission, whether it was intentional, whether it concealed a materially adverse interest, and whether the record can be supplemented without prejudice to the estate. *Id.*

Here, the Court finds that supplementation is sufficient. Although the initial disclosure was incomplete, the relevant relationships are now fully developed in the record. Through briefing and sworn testimony, the Court has been presented with the familial relationship, the prepetition claim and its waiver, the Debtor's ownership and operations, WWS's role, and the postpetition payments. There is no indication that the omission was willful or designed to conceal a disqualifying conflict, and no party has identified resulting prejudice to the bankruptcy estate.

Under these circumstances, disapproval of the Application is not warranted on disclosure grounds alone. The Court will require, however, that the record be formalized and complete going forward. Accordingly, WWS must file a supplemental Rule 2014 statement fully disclosing: (i) the waiver of its prepetition claim as established by sworn testimony; (ii) all postpetition payments received from the Debtor; and (iii) the scope of any work performed for related entities to the extent such work bears on this bankruptcy case. Failure to comply with these disclosure obligations may result in appropriate sanctions, including disgorgement of compensation.

## I. Doctrine of Necessity Does Not Override § 327(a)

The Debtor's doctrine-of-necessity argument deserves direct treatment because it was a substantial part of the briefing and oral argument. The Debtor contends, in substance, that WWS is so familiar with the Debtor's operations that replacing it would be inefficient, expensive, and detrimental to the reorganization. That practical point is well supported in the record. The Debtor has used WWS for about twenty-three years. WWS handles payroll, tax reporting, financial statements, and bankruptcy reporting. Jason Brooks testified that the firm's staffing model lowers costs and that the firm had already devoted roughly 130 hours to the matter, only 26 of which were his, demonstrating that work is delegated efficiently. John Paul Brooks testified credibly that replacing WWS would create a "mess" and that the Debtor lacks excess funds to pay a new firm to get up to speed.

Nevertheless, the UST is equally correct that doctrine of necessity is not the source of authority for employing professionals. The Debtor's cited cases, e.g., *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002), and similar cases addressing critical vendor relief, involved payment of critical vendors, not the qualification of professionals under § 327(a).

The Debtor's cited cases, including *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002), and *In re Pioneer Health Services, Inc.*, 570 B.R. 228 (Bankr. S.D. Miss. 2017), apply the doctrine of necessity in the context of critical-vendor payments. Those cases address when prepetition claims may be paid to preserve the debtor's operations. They do not govern the separate question of whether a professional satisfies the requirements of § 327(a). The Court, therefore, rejects any suggestion that necessity can excuse statutory disqualification. If WWS were a disqualifying insider under the Bankruptcy Code and remained a creditor without effective waiver, the Court could not simply approve the Application because retaining WWS would be more convenient.

Even so, that does not mean the practical realities are irrelevant. Once the statutory obstacles are resolved, here, by concluding that first cousins are not "relatives" under § 101(45), by requiring written waiver of the prepetition claim, and by bringing postpetition payments under Court supervision, the Court may and should consider whether retention is sensible and beneficial to the estate. In that narrower sense, the Debtor's practicality argument has force. It does not trump the Code. It confirms that conditional approval is the right result once the Code's requirements are satisfied.

### IV. CONCLUSION

This case presented an unusual but important threshold question under § 101(45), requiring the Court to resolve both a matter of statutory interpretation and the application of § 327(a) to a closely held business with longstanding professional relationships. The Court holds that a first cousin is not a "relative" within the third degree of consanguinity as determined by the common law for purposes of the Bankruptcy Code. That holding resolves the UST's principal insider argument. Even if the Court had reached the opposite conclusion on consanguinity, the Application

would not necessarily fail because insider status alone does not automatically establish a disqualifying adverse interest under § 327(a). The record here does not demonstrate that the cousin relationship, standing alone, impaired WWS's objectivity or loyalty.

The more serious statutory problem is that WWS was a prepetition Creditor. That issue has been sufficiently addressed on this record through the waiver established by sworn testimony. The postpetition payments were improper and cannot continue outside Court supervision, but they do not require outright disapproval of the Application so long as they are fully disclosed, subject to review, and not used to recover the waived prepetition claim.

The Court is also persuaded by the practical realities of this Chapter 11 case. WWS has served the Debtor for over twenty years, is deeply familiar with the Debtor's operations and systems, and can perform the necessary accounting work more efficiently and at lower cost than a newly retained firm. Those considerations do not override § 327(a), but once the statutory requirements are satisfied, they strongly support approval. Accordingly, the Application will be approved subject to conditions set forth below.

Based on the above, it is **ORDERED** that the Debtor's Application to Employ Watkins, Ward and Stafford as Accountant [Dkt. #46] is **APPROVED**, subject to the following conditions:

1. Within seven (7) days of entry of this Order, Watkins, Ward and Stafford shall file a supplemental disclosure under Federal Rule of Bankruptcy Procedure 2014 identifying:

   a. All postpetition payments received from the Debtor;
   b. The date and amount of each payment;
   c. Whether such funds are being held as retainers, have been applied to fees, or remain unapplied; and
   d. Any connection with related entities of the Debtor relevant to the services to be rendered in this case.

2.  No further postpetition payments shall be made to Watkins, Ward and Stafford absent Court approval or pursuant to a retainer arrangement expressly approved by further order of this Court.

3.  Any compensation sought by Watkins, Ward and Stafford shall be requested by application under 11 U.S.C. §§ 330 and 331 and shall remain subject to review and approval.

4.  The Court reserves the right to revisit this employment if later disclosures, fee applications, or other evidence demonstrate that the waived prepetition claim was indirectly recovered through postpetition payments or that any materially adverse interest exists.

##END OF ORDER##